IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DAVID GEORGE CHANDLER,

                            Plaintiff,

        v.

MAX WILLIAMS, DOC Director; Acting Super.
EOCI, RICK COURSEY; DON MILLS, former
EOCI Superintendent; RANDY GEER, DOC
Inmate Services Chief; RICHARD McGRAW,
EOCI Trans. Srvcs. Mgr.; GEORGIANNA
EMERY, EOCI Counselor; GARY CLARK, EOCI
Transitional Services Manager; PARKLYN
MAINE, EOCI Grievance Coordinator; BRIGITTE
AMSBERRY, EOCI Assistant Superintendent /
Transitional Services; and ROBERT HILLMICK,
EOCI Institution Counselor,

                           Defendants.

Case No. 3:08-cv-962-ST

FINDINGS AND
RECOMMENDATION

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, David George Chandler ("Chandler"), is an inmate with the Oregon Department of Corrections ("ODOC"), housed at the Eastern Oregon Correctional Institution ("EOCI") in Pendleton, Oregon.   On August 15, 2008, Chandler, appearing *pro se*, filed this case alleging that prison officials were violating his constitutional rights by refusing to place him in a correctional facility which houses only sex offenders and by refusing to provide him with publications which he ordered through the mail.   Nearly seven months later on March 2, 2009, Chandler filed an Amended Civil Rights Complaint (docket #25) ("Amended Complaint") against:   Max Williams ("Williams"), ODOC's Director; Rick Coursey ("Coursey") and Don Mills ("Mills"), EOCI's acting and former superintendents; Randy Geer ("Geer"), EOCI's Chief of Inmate Services; Richard McGraw ("McGraw") and Greg Clark ("Clark"), EOCI's Transitional Services Managers; Georgianna Emery ("Emery") and Robert Hillmick ("Hillmick"), EOCI counselors; Parklyn Maine ("Maine"), EOCI's Grievance Coordinator; and Brigitte Amsberry ("Amsberry"), EOCI's Assistant Superintendent of Transitional Services.   Chandler sues all defendants in both their individual and official capacities.

Chandler is a convicted sex offender.[1]   He alleges five claims under 42 USC § 1983 for violations of the First, Eighth and Fourteenth Amendments.   Claims I and III allege that defendants have violated Chandler's Eighth and Fourteenth Amendment rights by refusing to segregate him (and other sex offenders) into an ODOC facility that exclusively houses them or otherwise provides a safe environment.   The only apparent substantive difference between Claims

---

[1]   This court denied Chandler's petition for a writ of habeas corpus on November 12, 2008.   *Chandler v. Blackketter*, Civil No. 3:06-cv-1777-PK, Order (docket #34) (adopting Findings and Recommendations, docket #30).   The Order indicates that Chandler was convicted of one count of Rape in the Second Degree, two counts of Sodomy in the Second Degree, one count of Furnishing Alcohol to a Person Under 21 Years of Age, and one count of Endangering the Welfare of a Minor.   *Id*, pp. 2, 4.   He was sentenced to three consecutive terms of 75 months, for a total of 225 months.   *Id*, p. 4.

I and III is the timing of the grievance process.   Claim I involves a grievance processed between March 11, 2008, and July 17, 2009.   Claim III involves a grievance processed between February 3 and 23, 2009.   On these claims, Chandler seeks declaratory and injunctive relief to segregate all sex offenders in ODOC custody into separate, dedicated facilities or otherwise take reasonable measure to protect sex offender inmates from victimization by other inmates.

Claims II, IV, and V allege that Chandler's First and Fourteenth Amendment rights were violated when defendants rejected two books and a magazine he ordered as containing sexually explicit material, in violation of ODOC administrative rules concerning prohibited inmate mail. On March 7, 2011, this court granted defendants' Motion for Summary Judgment (docket #66) as to Claims II, IV, and V, and as to defendants Geer and Clark, and denied the motion with leave to renew with regard to the Eighth Amendment[2] issues in Claims I and III following the completion of discovery.   Opinion and Order (docket #119), adopting Findings and Recommendations (docket #111) ("F&R").   On June 29, 2011, this court appointed *pro bono* counsel to assist Chandler.

Defendants have now filed a Supplemental Motion for Summary Judgment (docket #174) against the remaining Eighth Amendment violations alleged in Claims I and III.   For the reasons that follow, the motion should be GRANTED as to Claims I and III (1) with respect to a separate dedicated facility for sex offenders and (2) against defendants Williams, Mills, Emery, Amesberry, Hillmick, and Maine, and otherwise DENIED.

## **LEGAL STANDARD**

---

[2]   This court also disallowed Claims I and III to the extent they were premised upon an alleged violation of the Fourteenth Amendment.   A plaintiff may not "'double up' constitutional claims . . . Where a claim can be analyzed under 'an explicit textual source' of rights in the constitution, a court may not also assess the claim under another 'more generalized,' source."   *Ramirez v. Butte-Silver Bow County*, 298 F3d 1022, 1029 (9th Cir 2002), quoting *Graham v. Connor*, 490 US 386, 394-95 (1989) (remaining citations omitted).

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.   FRCP 56(c).   The initial burden is on the moving party to point out the absence of any genuine issue of material fact.   Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried.   *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986).   On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party."   *Nicholson v. Hyannis Air Serv., Inc.*, 580 F3d 1116, 1122 n1 (9th Cir 2009) (internal quotation omitted).

## UNDISPUTED FACTS

Chandler was previously advised of the requirements for responding to summary judgment motions (docket #31), is now represented by *pro bono* counsel, and has had a full opportunity to obtain discovery to support his remaining two claims.   The following facts are taken from the fact statement in the previous F&R, as supplemented by materials submitted since then, and are viewed in the light most favorable to Chandler.

## I.   ODOC Housing Assignments and Protective Custody

ODOC currently houses approximately 14,000 inmates, nearly one-third (4,100) of whom are identified sex offenders.   Belleque Decl. (docket #69), ¶ 10; Lemens Supp. Decl. (docket #191), ¶ 3. [3]   Because ODOC does not house inmates based on their criminal convictions, it has no facility that exclusively houses sex offender inmates.   Belleque Decl., ¶ 6.   Instead, inmates are evaluated to determine the appropriate level of supervision needed (custody level) based on

---

[3]   Depositions are identified by the last name of the deponent and citations are to the page(s) of the deposition transcript.

their behavior in relationship to their environment (such as misconduct while incarcerated,

compliance with programming, and the amount of time remaining to serve on the sentence), which

then determines the appropriate housing assignment.   *Id*, ¶¶ 8, 10.   Upon admission, ODOC

assigns inmates through a classification process "to the lowest custody level deemed appropriate to

provide the amount of supervision necessary for the inmate" while at the same time providing

"reasonable protection to the general community, staff and inmate population . . . ."   *Id*, ¶ 7.

ODOC's goal is to "house inmates in general population where they have a greater number of

education and program opportunities to help with rehabilitation and change criminal thinking and

behavior."   *Id*, ¶ 9.   The vast majority of sex offenders in ODOC custody live in general

population ("GP") housing units, attend meals regularly, and participate in ODOC programs.

Lemens Supp. Decl., ¶ 3.

        Inmates who find themselves at peril in GP housing can request protective custody, but

must identify the person(s) they claim to fear in order to prevent a housing assignment in the same

housing unit or cell as the predator.   Belleque Decl., ¶ 15.   Assignment to protective custody is

not a given.   According to Chandler's witnesses, "[g]etting into protective custody in the ODOC

is nothing short of an act of God," preceded by a number of administrative hurdles.   Stroud Decl.

(docket #89), p. 2.

        ODOC contends that Chandler has twice been offered, but has declined, protective

custody.   Lemens Supp. Decl., ¶ 5.   This apparently consisted of an offer to transfer to the

Administrative Segregation Unit at Two Rivers Correctional Institution ("Two Rivers").

Chandler Supp. Decl. (docket #196), ¶ 7.[4]   Chandler describes Two Rivers as a "dark hole" that

---

[4] Chandler submitted two declarations, one during the initial round of summary judgment motions:   (1) Plaintiff's Declaration in
Support (docket #83), which is cited as "Chandler Decl." and (2) Declaration of Plaintiff in Opposition to Defendants Supplemental

does not necessarily offer better protection than housing at EOCI.   *Id*, ¶ 8.   Administrative

Segregation at Two Rivers involves living in two-man cells with no guarantee that the cellmate is

not violent or biased against sex offenders and with no guarantee of not being moved out of

Administrative Segregation into GP housing.   *Id.*   In addition, Two Rivers houses many inmates

who may be even more dangerous than at EOCI because ODOC has no other place to put them.

*Id*.

    Defendants do not segregate sex offenders from other inmates for several reasons.   First,

ODOC houses various types of sex offenders.   Belleque Decl., ¶ 12.   Some molest children,

while others target adult victims.   *Id.*   Some are homosexual, while others are heterosexual or

bisexual.   *Id.*   Some are predatory, while others are opportunistic.   *Id.*   In addition, creating

separate housing for sex offenders presents the likelihood that other groups of inmates could claim

to need separate housing, such as those in security threat groups ("STGs"), or gangs, whose

members are enemies of other STGs and which would lead to promoting the very STG activities

ODOC seeks to prevent.   *Id*, ¶ 11.   Finally, sex offenders may be convicted of other crimes,

which complicates the decision of whether those other crimes or the sex offense should be the

basis of the housing assignment.   *Id*, ¶ 13.

///

///

///

///

## II.  <u>Chandler's In-Custody History</u>

---

Motion for Summary Judgment (docket #196), which is cited as "Chandler Supp. Decl."

A.  **Housing Assignments**

After spending approximately 17 months at the Clackamas County Jail awaiting trial and

sentencing, Chandler was placed in ODOC custody at the intake center at the Coffee Creek

Correctional Facility ("Coffee Creek") in February 2003.   Chandler Depo., pp. 6-7.   He returned

briefly to the Clackamas County Jail for post-trial motions, then was transported back to Coffee

Creek and from there to EOCI in March 2003.   *Id*, pp. 7-8.

Apparently due to media coverage, another inmate being transported to Coffee Creek with

Chandler knew the charges for which Chandler had been convicted and was "harassing" him.   *Id*,

pp. 20-22.   After arriving at Coffee Creek, Chandler received "daily threats from other inmates

. . . because of his charges."   *Id*, p. 12.   He was placed on "suicide watch" because he had

expressed suicidal ideation and "never once left [his] cell to eat because [he] knew what [he]

would encounter if [he] did."   *Id*, pp. 8-9, 20.   He reported the harassment to security staff who

"refused to do anything about it."   *Id*, p. 20.   Chandler did not try to identify particular inmates

who were harassing him to security staff for fear he would be labeled a "snitch."   *Id*, p. 21.

On March 20, 2003, just prior to his transport to EOCI, Chandler was placed in a holding

cell with other inmates, one of whom threatened to attack him.   Chandler Decl., pp. 1-2; Chandler

Depo., p. 22.   He alerted a corrections officer who placed him in a separate holding cell by

himself.   Chandler Decl., p. 3.   During the drive to EOCI later that day, Chandler was threatened

again by the same inmate, but the driver did nothing.   *Id*; Chandler Depo., pp. 22-23.

Prior to Chandler's arrival at EOCI, the staff psychologist at Coffee Creek spoke with the

Behavioral Health Services ("BHS") Manager at EOCI and they agreed that the best placement for

Chandler was in the F2 Unit.   Chandler Depo., pp. 11-12.   The F2 Unit, also known as the

"Mental Health Unit," houses mostly inmates described by Chandler as "mental health-flagged" and "generally better behaved than guys on most other units."    *Id*, p. 9; Chandler Decl., pp. 4-5. The F2 Unit is an open dorm housing facility and generally believed by inmates to house a large population of sex offenders and those who have been "specifically selected to be there because of mental health issues and . . . who basically agreed that they will do the[ir] best to get along." Chandler Depo., pp. 9-10.

### B.  EOCI Threats and Assault

Upon his arrival at EOCI, Chandler was placed in GP housing, despite the earlier agreement between Coffee Creek and EOCI officials that he should be housed in the F2 Unit. Belleque Decl. (docket #69), Att. 1, p. 3; Chandler Depo., pp. 12-13, 24.   His cellmate immediately demanded to know his charges.   Chandler Decl., p. 4; Chandler Depo., p. 24. Chandler told him the truth about his convictions because he knew he would be expected to show his "paperwork" and that lying would only make things worse in the long run.   Chandler Decl., p. 4; Chandler Depo., p. 24.   His cellmate told Chandler that he would be expected to "pay rent" by providing him with canteen items in order to avoid an assault.   Chandler Decl., p. 4; Chandler Depo., p. 24.   However, about an hour after his placement in GP housing, Chandler was reassigned to the F2 Unit.   Belleque Decl., Att. 1, p. 3.

As soon as he arrived at EOCI, anonymous inmates would come by his cell, bang on his door, yell names at him and threaten him.   Chandler Depo., p. 20.   Out of fear, he never left his cell to eat.   *Id.*   He reported the harassment to Captain Hepler who did nothing.   *Id.*

Sometime after his arrival at EOCI, the inmate who had threatened to attack Chandler at the Clackamas County Jail identified Chandler as a sex offender to other EOCI inmates.

Chandler Decl., p. 4; Chandler Depo., p. 22.   Because that inmate worked in the dining or "chow"

hall, Chandler could not avoid him.   Chandler Depo., p. 22.

About a year later in May 2004, Chandler was unexpectedly told to move to a cell in a GP

Unit on the other side of the prison.   Chandler Decl., p. 5; Chandler Depo., p. 13.   He refused and,

as a result, was sent to the Disciplinary Segregation Unit ("DSU") for two months, then transferred

to the Special Management Unit ("SMU") at the Snake River Correctional Facility for three

weeks.   Chandler Decl., p. 5; Belleque Decl., Att. 1, p. 4; Chandler Depo., pp. 13-14.

In the spring of 2005, Chandler was "unexpectedly assaulted in the bathroom of the F2

Unit by another inmate" who grabbed him by the throat and slapped him, calling him "rape-o" and

telling Chandler not to disrespect him.   Chandler Decl., p. 6; Chandler Depo., p. 27.   However

the assault "wasn't serious," required no medical treatment or medication, and resulted in only

"temporary" pain.   Chandler Depo., p. 28.   Chandler did not tell EOCI security staff, again

fearing he would be labeled a "snitch."   Chandler Decl., p. 6.   However, he did tell the mental

health staff who said they would "monitor" the other inmate.   *Id*; Chandler Depo., p. 27.   That

inmate assaulted another inmate about a month later and was removed from the F2 Unit.

Chandler Decl., p. 6; Chandler Depo., pp. 27-28.

In order to protect himself from possible targeting and attack as a sex offender, Chandler

has refused to be housed in the GP Unit[5] and never attends recreational yard or multi-purpose

activities at EOCI.   Chandler Depo., p. 58.   The dining hall has posed a particular problem for

him.   In December 2004, Chandler was scheduled to work in the dining hall the entire weekend.

---

[5]   Although Chandler contends that he has "repeatedly" refused to be housed in the GP Unit (Chandler Decl., p. 5), his prison housing record reflects only one lengthy (May - July 2004) stay in the DSU for refusing to move to the GP Unit.   Belleque Decl., Att. 1, pp. 1-5.

*Id*, p. 15.   Fearing for his safety and unable to discuss the placement with BHS staff, Chandler asked the housing unit officer to be excused from that job assignment.   *Id*.   He was not excused, refused to go to the dining hall the next morning, and, as a result, spent about another two weeks in the DSU.   *Id*, pp. 15-16.   Approximately half of the dining hall is unavailable to him because he must obtain permission from the other inmates to sit.   Chandler Depo., p. 35.   In February 2007, Chandler refused the order of a corrections officer to sit at a certain table in the dining hall because he did not feel safe sitting there.   *Id*, p. 16.   Instead, he gave his food to another inmate, lost his temper, and got into an argument with the officer.   *Id*.   He spent about three weeks in the DSU as a result of that confrontation.   *Id*; Chandler Decl., pp. 4-6; Belleque Decl., Att. 1, p. 5.   To protect himself from harassment in the dining hall, Chandler does not regularly attend meals in the dining hall and instead skips most meals and eats on the F2 Unit, subsisting "mostly on items purchased from the canteen."   Chandler Depo., p. 34; Chandler Decl., p. 5.

Chandler has submitted evidence from other EOCI inmates supporting his fear of being attacked by other inmates at EOCI.   William Peckenpaugh, a sex offender, describes how inmates are asked by other inmates to "show their paperwork" in order to identify sex offenders. Peckenpaugh Decl., pp. 1-2.   To refuse that request is treated as identifying oneself as a sex offender.   *Id*, p. 2.   Predatory inmates also obtain details about other inmates from newspapers and the internet.   *Id.*   Sex offenders are routinely subjected to harassment, threats, extortion, and violence by other inmates, especially STGs.   *Id.*   Although some sex offenders are assaulted "right from the first, generally they are extorted first" by being asked to "pay rent," and are assaulted if they refuse or stop.   *Id,* pp. 2-3.   "[I]t usually takes an inmate being assaulted at least three times before ODOC staff will choose to protect' him – if then."   *Id*, p. 3.   However, the

protection is "temporary at best" and "often contingent upon informing on those who extort, assault, or threaten to do so."   *Id*.   Doing so places the sex offender "at greater risk for physical violence, as he is now both a [sex offender] and an informant."   *Id*, p. 4.   He also has observed ODOC staff "turning a blind eye" to extortion and violence against sex offender inmates and sometimes condoning or participating in the victimization.   *Id*, p. 6.

Steven Stroud confirms the threat posed by STGs to vulnerable inmates, such as the mentally challenged and sex offenders.   Stroud Decl., pp. 1-2.   A sex offender is told by one of the STGs to pay "rent" (money or canteen items) or he "will get beaten up" or sometimes told to beat up another inmate.   *Id*, p. 2.   An inmate who seeks help from the staff is labeled a "rat" and placed at a greater risk of assault.   *Id*.   Even if an inmate seeks help from the staff, getting into protective custody "is nothing short of an act of God."   *Id*, p. 2.   He describes the STG problem as "out of control" because they "are powerful and control a lot of daily activities like the yard and cafeteria," placing vulnerable inmates in danger.   *Id*, p. 3.

Jerry Jones is a sex offender housed in the F2 Unit.   Jones Decl., pp. 1-2; Second Jones Decl. (docket # 815), ¶ 1.   He has observed sex offenders in the F2 Unit attacked in the dining hall, recreation yard, main compound, and even in the F2 Unit by GP inmates.   Jones Decl., p. 2. The victims have been attacked several times before being moved.   *Id*.   Because of verbal harassment and being pushed around and threatened with assault, he does not often go to the recreation yard.[6]   *Id*, p. 3; Second Jones Decl., ¶ 6.   He also has been turned away from sitting at certain tables in the dining hall by gang members and threatened if he tried to sit where he was not wanted.   Second Jones Decl., ¶¶ 2, 5.   On one occasion when he and other inmates were ordered

---

[6]   Although not stated in his Declaration, Chandler submits that public information available online from the ODOC Offender Search indicates that Jones has been convicted of two sex offenses.

to sit with gang members, several chose to dump their trays and return to their unit rather than risk harm by sitting there. *Id, ¶* 3.

Justin Blackledge, a sex offender, was extorted in a day room, harassed and threatened. Blackledge Decl. ¶¶ 2-3. He ended up paying "rent" at least three times to avoid being assaulted. *Id, ¶* 2. The dining hall would get crowded with the only available seats in the known gang areas, causing him to leave with just one piece of fruit. *Id, ¶* 4. He witnessed prison officers laughing when inmates left without a meal due to lack of seats. *Id.* He was repeatedly turned away from tables or told not to sit at certain tables by gang members. *Id*, ¶ 5. He never felt safe in the dining hall. *Id*, ¶ 6. He and other inmates on the mental health unit were harassed regularly in the overcrowded dining hall in front of prison officers who said or did nothing. *Id.* Although he requested protective custody and reported overhearing other inmates talking about beating him up, his request was denied or he was told that they had no place to put him. *Id*, ¶ 7. He told Chandler about being harassed by other inmates at EOCI. *Id*, ¶ 9.

Daniel Timmons, a sex offender, reports being extorted and threatened with assault. Timmons Decl., pp. 1-2. Security staff has told him to just "deal with it." *Id.* For him, the "only potentially safe place" is disciplinary segregation or being on suicide watch. *Id*, p. 2.

Joseph Gibel, another sex offender, stated that upon assignment to the GP Unit at EOCI, he was taken to the bathroom and questioned regarding his charges. Gibel Decl., p. 2. At a later date, he was placed in another GP housing assignment and refused to show his paperwork when demanded. *Id*, pp. 3-4. Three inmates verbally and physically attacked him for his refusal. *Id*, pp. 3-4. He was moved again and attacked within 30 minutes of arriving at his new housing assignment. *Id*, p. 4. For fear of being attacked, he did not go to the yard, card room or even

religious services.   *Id*, p. 5.   He confirms that STGs prey on sex offenders by assaulting them if they do not either "pay rent" or agree to become a "torpedo" by attacking another inmate.   *Id,* p. 3. Those who are assaulted by a "torpedo" are expected to lie and claim that it was a mutual fight. *Id*.   The danger to a victim "increases exponentially" if he seeks help from security and is then labeled a "rat" or snitch.   *Id.*

Douglas Smith, an independent counselor who once worked at EOCI, confirms that prisoners labeled as sex offenders (even incorrectly) reported being subjected to "harassment, coercion, menacing, extortion and assault at the hands of other inmates" when in GP areas such as the recreation yard or cafeteria.   Smith Decl., p. 1.   As a result, many F2 Unit inmates avoided the cafeteria and yard.   *Id.*

### C.   Response by EOCI

Chandler has complained about being harassed in the dining hall the entire time he has been at EOCI.   Chandler Depo., p. 30.   Under EOCI's dining hall regulations, "[i]nmates are not permitted to save seats at any table in the dining room."   Cady Decl., Ex. 1 ("Dining Room Regulations"), p. 2, #18.   Nevertheless, Chandler has "repeatedly been intimidated . . . by various inmates telling [him] not to sit in certain spots" in the dining hall.   Chandler Decl., p. 5.   Inmates are required to leave the dining hall immediately upon finishing their meal and turning in tableware.   Dining Room Regulations, p. 2, #21.   Despite that rule, Chandler asserts that the dining hall is consistently overcrowded, which puts him at risk for being forced to sit at a table with STG inmates or inmates who otherwise present a safety risk to him.   Chandler Depo., p. 30.

The record contains a host of documents dated between July 20, 2009, and May 2, 2012, after the filing of Chandler's Amended Complaint, which address Chandler's complaints of

overcrowding in the dining hall.   On July 20, 2009, EOCI staff told Chandler that they were

allowing more time to elapse before calling the F2 Unit to the dining hall, which seemed to be

alleviating some of the overcrowding.   Supplemental Cady Decl. (docket #184), Ex. 2 (July 20,

2009 response to July 10, 2009 grievance).

Chandler admits that in 2009 some captains did allow more time to pass before calling the

F2 Unit to the dining hall which did seem to improve conditions in the dining hall.   Chandler

Supp. Decl., ¶ 1; Lemens Supp. Decl., ¶ 6.   However, there has been no consistency in how

quickly the F2 Unit is called to the dining hall, and sometimes no time extra time is allowed.

Chandler Supp. Decl., ¶ 1.   Chandler also recounts that at least one inmate has been disciplined

for throwing his food away because he could not find a safe place to sit.   *Id*, ¶ 2; Dining Room

Regulations, p. 2, #20.

EOCI staff have rebuffed Chandler's suggestions that:   (1) EOCI institute a written

guideline for staff to follow regarding calling housing units to meals (*id*, Ex. 3 (August 10, 2009));

(2) the F2 Unit be called to meals before other housing units (*id*, Ex. 4 (August 23, 2010); Ex. 6,

August 26, 2010)); (3) sack lunches be provided to F2 Unit inmates (Cady Decl. (docket #183),

Ex. 9 (June 14, 2011)); (4) a map be provided identifying dining room tables occupied by STG

(security threat group) inmates (Supplemental Cady Decl., Ex. 6 (August 26, 2010)); and

(5) Chandler be allowed early access to the dining hall (*id*, Ex. 4 (August 23, 2010)).   In October

2011, and again in May 2012, in response to Chandler's failure to regularly go to meals in the

dining hall, EOCI instituted "monitoring" of Chandler's health.   Cady Decl., Exs. 8, 10;

Supplemental Cady Decl., Ex. 5 (medical chart notes May 9-11, 2012).   Chandler has worked

with his counselor to "develop a behavioral management plan where he notes what he eats each day in a journal to ensure he is obtaining adequate food."   Lemens Supp. Decl., ¶ 5.

EOCI has not made any other changes in its policies or practices response to Chandler's complaints.

## FINDINGS

### I.  Nature of the Remaining Claims

Both Claims I and III allege that Chandler and other sex offender inmates are being subjected to cruel and unusual punishment in violation of the Eighth Amendment by defendants' failure to provide them with reasonably safe access to the dining hall, recreation yard, and other areas where they are forced to intermingle with GP inmates.   Underlying Claims I and III – which on their face simply demand that Chandler and other sex offenders be housed in a segregated facility – are assertions that Chandler faces a constitutionally impermissible risk of danger when forced to intermingle with inmates from GP housing units.[7]   Although he is assigned to the F2 Unit, and not to a GP Unit, his access to the dining hall, recreation yard, and worship facilities require such intermingling.   Chandler asserts that he faces a constitutionally unacceptable risk of assault when forced to intermingle and, as a result, seeks placement in a segregated facility.

Both claims have been exhausted through two grievance processes.   Claim I alleges that defendants flatly rejected Chandler's March 2008 inmate communication to Emery and a subsequent grievance appeal processed by Maine, Amsberry, and McGraw, in which he requested that all sex offenders be segregated in an separate prison.   Claim III alleges that defendants denied

---

[7]   On August 26, 2010, District Judge Garr M. King denied Chandler's request for a temporary restraining order and preliminary injunction ordering defendants to permit him to attend early meals in the dining hall and implement a policy indefinitely placing the F2 Unit first in the meal rotation.   Order (docket #106).   That Order was based, in part, on the fact that the pleadings do not expressly make a claim regarding the timing of meals provided to Chandler or other F2 Unit inmates.   *Id*, p. 3.   This court broadly construes Claims I and III to allege a failure to protect in the dining hall based on the need to "ensure [his] safety" (Amended Complaint, ¶ 5) and Chandler's expressed desire to have "a safe environment . . . to eat and exercise" (*id*, p. 7).

a February 2009 request to Hillmick and subsequent grievance appeal processed by Maine, in which Chandler requested transfer to a facility exclusively housing sex offenders.

Defendants seek summary judgment based on the lack of any viable Eighth Amendment violation and on the basis of qualified immunity.   As discussed in the previous F&R, pp. 11-12, this court interprets Chandler's pleadings to seek equitable relief and only incidental monetary damages, obviating a need to discuss the issue of qualified immunity.   In particular, Claims I and III seek a declaration that defendants' actions are unconstitutional and a permanent injunction requiring defendants to segregate all sex offenders in ODOC custody into separate, dedicated facilities or otherwise take reasonable measures to protect sex offender inmates from victimization by other inmates.

## II.  <u>Eighth Amendment Violation</u>

### A.  <u>Legal Standard</u>

Where "prison officials have legitimate administrative authority, such as the discretion to move inmates from prison to prison or from cell to cell," the Constitution "imposes few restrictions on the use of that authority."   *Grayson v. Rison,* 945 F2d 1064, 1067 (9th Cir 1991). The Supreme Court has made clear that the state is entitled to place an inmate at a prison of its choosing, unfettered by inmate claims to a liberty interest in different housing:

> The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause.   But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution.   The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison, if, as is likely, the State has more than one correctional

16 - FINDINGS AND RECOMMENDATION

> institution.   The initial decision to assign the convict to a particular
> institution is not subject to audit under the Due Process Clause, although
> the degree of confinement in one prison may be quite different from that
> in another.   The conviction has sufficiently extinguished the
> defendant's liberty interest to empower the State to confine him in *any* of
> its prisons.

*Meachum v. Fano*, 427 US 215, 224 (1976) (emphasis in original).

However, the state's broad power to assign prisoners to any of its prisons is tempered by the strictures of the Eighth Amendment.   The conditions of confinement may not "*otherwise violate the Constitution*."   *Id* (emphasis added).   With regard to the Eighth Amendment, a prisoner's conditions of confinement must not "involve the wanton and unnecessary infliction of pain, . . . pain without any penological purpose . . . [or result in] serious deprivation of basic human needs."   *Rhodes v. Chapman*, 452 US 337, 347 (1981).

The Eighth Amendment requires prison officials to provide humane conditions of confinement by ensuring that inmates receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 US 825, 832 (1994).   In addition, it places a burden on prison officials to "take reasonable measures to guarantee the safety of the inmates."   *Hudson v. Palmer*, 468 US 517, 526-27 (1984).   Being subjected to assault is not "part of the penalty that criminal offenders [must] pay for their offenses."   *Rhodes*, 452 US at 347.   However, "a prison official does not violate the Eighth Amendment every time an inmate gets attacked by another inmate."   *Dale v. Poston*, 548 F3d 563, 569 (7th Cir 2008).   A prison official violates the Eighth Amendment only if he or she is deliberately indifferent to the need to protect an inmate from a substantial risk of serious harm from other inmates.   *Farmer*, 511 US at 834.

*Farmer* is particularly instructive because of significant factual parallels to this case.   The plaintiff in *Farmer* was a biologically male, pre-operative transsexual who was placed in the

general male prison population.   Two weeks later, he was beaten and raped by another inmate in his cell.   When he sued various prison officials for violating his Eighth Amendment rights, the district court granted summary judgment to the defendants which the Seventh Circuit summarily affirmed.   Vacating and remanding, the Supreme Court confirmed that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners."   *Id* at 833 (quotation and alteration omitted).

The Court held that a failure to meet this duty violates the Eighth Amendment when two requirements are met.   First, the alleged deprivation must be "sufficiently serious" under an objective standard.   *Id* at 834 (quotation omitted).   In cases involving a failure to prevent harm, this means that the prisoner must show that the conditions of his incarceration present an objective "substantial risk of serious harm."   *Id.*

Second, the prisoner must show that prison officials had subjective knowledge of the risk of harm.   In other words, an official "must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id* at 837.   This knowledge may be proved "in the usual ways, including inference from circumstantial evidence, and a fact-finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."   *Id* at 842 (citation omitted).   For example:

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Id* at 842–43 (quotations omitted).

18 - FINDINGS AND RECOMMENDATION

Continuing its explanation of the subjective prong, the Court warned that prison officials cannot escape liability merely by claiming that they "did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." *Id* at 843.   For Eighth Amendment purposes, "it does not matter whether the risk comes from a single source or multiple sources . . . ."   *Id*.   Nor does it matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."   *Id*.   "If, for example, prison officials were aware that inmate 'rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station,' it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom."   *Id* (citations omitted).

During the first round of summary judgment submissions, defendants' relative silence in the face of Chandler's troubling assertions persuaded this court that discovery should be explored to flesh out Chandler's claims of danger and deliberate indifference.   With the assistance of counsel, he has now presented additional evidence to substantiate his claim that defendants' failure to protect him from the risk of harassment and assault when forced to intermingle with GP housed inmates falls below the constitutionally permissible standard of care.   In response, defendants have submitted additional evidence.   Viewing the evidence in the light most favorable to Chandler, this court concludes that Chandler has created a sufficient issue of material fact to preclude summary judgment.

## B.  **Objective Component:   Sufficiently Serious Deprivation**

19 - FINDINGS AND RECOMMENDATION

The objective component of the Eighth Amendment inquiry requires Chandler to prove a "substantial risk of serious harm."  *Farmer*, 511 US at 828.  Defendants argue that Chandler has not yet suffered any serious harm and faces no substantial risk of serious harm.

As noted by the Tenth Circuit, "the harm of sexual assault is 'serious' enough to have Eighth Amendment implications."  *Howard v. Waide*, 534 F3d 1227, 1237 (10th Cir 2008) (citations omitted).  Chandler suffered one actual assault in 2005, over four years before he filed this case in 2009, when he was grabbed and slapped by another inmate.  However, he admitted that the attack "wasn't serious" and that it did not occur in an area where he was forced to intermingle with GP housed inmates, but in the F2 Unit itself which Chandler acknowledges is for the most part comprised of inmates who do their best to get along.  Chandler Decl., pp. 4-5; Chandler Depo, p. 9, 28.  Therefore, this assault alone does not suffice to prove the objective component of his Eighth Amendment claim.

Chandler's assertions that he has suffered verbal "harassment" by other inmates based on the nature of his convictions also are insufficient to satisfy the objective prong.  *Watison v. Carter*, 668 F3d 1108, 1113 (9th Cir 2012) (citing cases involving "verbal insults between inmates and guards," "humiliation" by female guards pointing, joking, and "gawking" at showering male inmate, and brief unwanted touching by prison maintenance employees).  He cannot recall ever being the target of "specific aggressive threats."  Chandler Depo., p. 26.  At worst, he has established ongoing "harassment" in encounters with GP housed inmates housed, consisting of name-calling which is specifically directed at him due to his status as a sex offender.  Therefore, Chandler has not suffered any actual serious injury sufficient to satisfy the objective component of an Eighth Amendment claim.

However, an Eighth Amendment claim can be based on a threat of future harm.   *Helling v. McKinney*, 509 US 25, 33-34 (1993).   Chandler has been frequently threatened due to his sex offender status, as well as targeted for extortion and the payment of "rent."   Even though he has not paid "rent" (Chandler Depo., p. 25), he knows that the threats are real based the extortion and assaults suffered by other sex offenders.   Fearing for his safety, Chandler has avoided extortion and physical harm by not intermingling with GP housed inmates.   Therefore, he does not get exercise, does not attend meals in the dining hall, and refuses to work.   Defendants dismiss Chandler's fear as entirely subjective.

As noted in this court's earlier F&R, the Supreme Court has expressly declined to decide the point at which a *risk* of assault violates the Eighth Amendment.   *Farmer*, 511 US at 834 n3 ("At what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes is a question this case does not present, and we do not address it.").   Eight years post-*Farmer* in *Estate of Ford v. Ramirez-Palmer*, 301 F3d 1043 (9th Cir 2002), the Ninth Circuit granted qualified immunity to prison officials who had double-celled a prisoner who later killed his cellmate.   This decision rested on the court's conclusion that "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm" because "neither *Farmer* nor subsequent authorities has fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'"   *Id* at 1050 (emphasis in original), quoting *Farmer*, 511 US at 834 n3.

Since that time, several courts have grappled with the issue, with at least two courts concluding that explicit threats made against a particular individual and reported to prison officials

may give rise to a duty to act under the Eighth Amendment.   *See Rodriguez v. Sect'y for Dep't of Corr.*, 508 F3d 611, 617 n12 (11th Cir 2007) (gang-related threats explicitly reported to prison officials presented a substantial enough risk of harm to trigger an Eighth Amendment duty to act); *Odom v. S. Carolina Dep't of Corr.*, 349 F3d 765, 770 (4th Cir 2003) (inmate-on-inmate assault resulting in significant physical injury, preceded by reported death threats, was sufficiently substantial for Eighth Amendment purposes).   In addition, an objectively serious risk of harm may exist where a plaintiff is assigned to the same cell as another inmate with a violent or predatory history.   *Nelson v. Shuffman*, 603 F3d 439, 447 (8th Cir 2010) (substantial risk of serious harm may exist where inmate with violent history made threats against plaintiff).   In such cases, "the assailant's conduct can provide the court 'the most probative evidence of the degree and type of risk that [the inmate] faced.'"   *Id*, quoting *Young v. Selk*, 508 F3d 868, 872 (8th Cir 2007).   At least one court has concluded that the Eighth Amendment may protect against a known risk of harm to a plaintiff who was "unusually vulnerable to predators" due to being a "non-violent offender who is openly homosexual [and] of slight build.   *Howard*, 534 F3d at 1230.

As these cases reveal, while a prisoner need not "await a tragic event such as an actual assault before obtaining relief," *Farmer*, 511 US at 845 (citation and brackets omitted), a "mere naked threat" does not suffice to establish a constitutional wrong.   *Gaut v. Sunn*, 810 F2d 923, 925 (9th Cir 1987) (" [I]t trivializes the eighth amendment to believe a threat constitutes a constitutional wrong.").   Similarly, a "mere suspicion that an attack will occur" is not enough.   *Berg v. Kincheloe*, 794 F2d 457, 459 (9th Cir 1986).

The evidence in this case supports more than a mere suspicion that an attack will occur.   Chandler and his witnesses paint a bleak picture for sex offender inmates.   Upon their arrival at

ODOC facilities, STG inmates routinely demand "paperwork" from new inmates.   If the new

inmate is convicted of a sex crime, he is given a short list of options:   pay "rent" to avoid an

attack; act as a "torpedo" and attack other inmates identified by the STG inmates; or be attacked

himself.   If attacked, the targeted inmate is required to fight back and not report the incident as an

unprovoked attack or otherwise be considered a "rat" or "snitch," becoming the target of additional

attacks.   To avoid this unprovoked violence, many sex offender inmates seek refuge in the F2

Unit, then avoid those areas with GP housed inmates, refusing to go to meals in the dining hall,

work in the dining hall, accept assignments to cells in the GP Unit, and feign suicidal ideation in

order to get placed on "suicide watch" or placed in the DSU where they are housed in the relative

safety of solitary cells.   As a result, they repeatedly forfeit meals, exercise, recreation, and other

activities in order to avoid assault.   The only solution offered to them by ODOC staff is to tell sex

offender inmates to lie about their charges or refuse to discuss them, neither of which prevents

other inmates from either discovering their charges and targeting them, or assuming they are sex

offenders by their silence.

    This court previously found that the risk of harm faced by sex offender inmates at EOCI,

combined with evidence from Chandler's witnesses chronicling assaults of sex offender inmates

and a lack of any information to gauge the adequacy of defendants' response, were sufficient to

avoid summary judgment on the first prong of the *Farmer* inquiry and proceed to discovery.

Although defendants have now submitted additional evidence, none of that evidence disputes the

existence of a pervasive risk of harassment, extortion and assault on sex offender inmates at EOCI

when intermingling with GP inmates.   Nor does it dispute the attempt by sex offender inmates to

avoid that risk by skipping meals and exercise and otherwise avoiding the GP inmates.   Instead,

23 - FINDINGS AND RECOMMENDATION

defendants' evidence addresses only whether their response is reasonable under the circumstances such that they are not deliberately indifferent to that risk to Chandler.   None of this evidence bears upon whether Chandler has established there is a substantial risk of serious harm.

Accordingly, Chandler's evidence of the risk of harm faced by him as a sex offender at EOCI from GP housed inmates satisfies the objective test set forth in *Farmer.*

### C.   Subjective Component:   Deliberate Indifference

The second prong of an Eighth Amendment claim requires Chandler also to establish that defendants were "deliberately indifferent" to the substantial risk of serious harm to him. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his [or her] action."   *Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 US 397, 410 (1997).   "[T]he standard in this circuit [is] not gross negligence, but 'deliberate indifference to a known, or so obvious as to imply knowledge of, danger.'"   *Kennedy v. City of Ridgefield*, 439 F3d 1055, 1064 (9th Cir 2006), quoting *L.W. v. Grubbs*, 92 F3d 894, 900 (9th Cir 1996); *see also*, *Tamas v. Dep't of Social & Health Servs.*, 630 F3d 833, 844 n10 (9th Cir 2010), citing *Kennedy*, 439 F3d at 1064.

Unlike many of the cases allowing an Eighth Amendment claim to proceed, this case does not involve a claim that the prison officials were themselves perpetrating the abuse, brandishing weapons or spreading rumors that put the inmate at increased risk.   *See Burton v. Livingston*, 791 F2d 97, 100 (8th Cir 1986) (drawing gun and terrorizing prisoner with threats of death while using racially offensive language states first amendment, due process and equal protection claims); *see also Valandingham v. Bojorquez*, 866 F2d 1135, 1138 (9th Cir 1989) (deliberately spreading rumor that prisoner is snitch may state claim for violation of right to be protected from violence while in

state custody); *Parker v. Asher*, 701 F Supp 192, 194 (D Nev 1988) (threatening to shoot inmate

with taser gun merely to inflict gratuitous fear and punishment states claim under Eighth and

Fourteenth Amendments).   When the officials sued are not the individual(s) who inflicted the

injury, it is essential that the officials be on notice of the substantial risk to the inmate.   *See Wood*

*v. Beauclair*, 692 F3d 1041, 1051 (9th Cir 2012) (affirming grant of summary judgment to

supervisory prison officials where there was "no evidence that the supervisory defendants were on

notice that [a prison guard] presented a substantial risk to [the plaintiff]").

The deliberate indifference standard "must not be applied to an idealized vision of prison

life, but to the prison as it exists, and as prison official(s) are realistically capable of influencing."

*Berg*, 794 F2d at 462.   Deliberate indifference is evaluated in this context by considering

"whether, in allegedly exposing the prisoner to danger, the defendant prison official(s) were

guided by considerations of safety to other inmates, whether the official(s) took 'prophylactic or

preventive measures' to protect the prisoner, and whether less dangerous alternatives were in fact

available."   *Id* (citation omitted).   Both "context, as well as consequences" must be considered

and, if the "evidence only involves a "dispute over the . . . existence of arguably superior

alternatives," then the Supreme Court has indicated that the plaintiff has not met his burden and the

case should not be presented to a jury."   *Id*, quoting *Whitley v. Albers*, 475 US 312, 322 (1986).

///

### 1.   Defendants' Subjective Knowledge

The stigmatizing nature of being classified as a sex offender is undeniable.   "We can

hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a

prison inmate as a sex offender."   *Neal v. Shimoda*, 131 F3d 818, 829 (9th Cir 1997).   ODOC

cannot (and does not) deny that sex offenders are a vulnerable group of inmates, as confirmed by its own regulations.   *See* Cady Decl., Ex. 2, p. 4 (Prison Rape Elimination Act provision listing sex offenders as among vulnerable inmates).   McGraw confirms that sex offenders are viewed as less acceptable to other inmates and, as a result, are treated differently by other inmates.   McGraw Depo., pp. 11-12, 32-34, 53-54.   Combined with the evidence of extortion and assault of sex offenders submitted by Chandler's witnesses, this is circumstantial evidence that all prison officials at EOCI were aware of a general threat of violence to sex offenders.

Chandler also has presented direct evidence that, due to his status as a sex offender, he has been assaulted in the past and threatened continuously during his incarceration, as have other sex offender inmates.   He reported his 2005 assault to the mental health staff and has filed numerous inmate communications forms and grievances regarding his fears and the risk that he and other sex offenders face.   Chandler Depo., p. 30; McGraw Depo. Exs. 1-3; Cady Decl., Att. 3-10.   In addition, this court may take judicial notice of another case filed in this court that establishes notice of this same risk.   In *Heilman v. Coursey, et al*, Case No. 3:11-cv-000594-KI, another sex offender inmate at EOCI alleges that Coursey and other individuals are liable for violating his Eighth Amendment rights when they allowed two inmates to enter his cell and assault him to the point of unconsciousness on January 23, 2010.   As does Chandler, that inmate alleges that he had previously complained to EOCI security and others about being threatened with extortion by gang members and asked to be moved, to no avail.

Although clearly aware of the generalized risk of harm to sex offenders from other inmates, defendants respond that Chandler has failed to prove any substantial risk of harm to him.   They take the position that deliberate indifference requires them to be aware of and consciously

disregard a specific threat made by a specific individual to physically harm Chandler.   However, as discussed above, Chandler has submitted sufficient evidence to raise a fact issue that a pervasive risk of harm to sex offenders exists at EOCI when intermingling with GP housed inmates.   If true, then Chandler's status as a sex offender inmate, combined with his complaints to EOCI staff of his fear of being harmed, is sufficient to prove a substantial risk of serious harm to him.   He does not need to first suffer a serious assault.   The fact that Chandler has so far been able to avoid serious harm by denying himself exercise, food, and work does not excuse defendants from knowledge of a substantial risk of serious harm.   As explained by the Supreme Court:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.   For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk."

*Farmer*, 511 US at 842-43 (citations omitted).

///

///

## 2.  **Defendants' Response**

Although defendants may know of a substantial risk to inmate health or safety, they nonetheless "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted."   *Howard*, 534 F3d at 1239, quoting *Farmer*, 511 US at 844-45. "An official responds to a known risk in an objectively unreasonable manner if he knew of ways to

reduce the harm but knowingly [or] recklessly declined to act."   *Rodriguez*, 508 F3d at 620

(internal quotation marks and citation omitted); *also see Larez v. City of Los Angeles*, 946 F2d 630,

646 (9th Cir 1991) (upholding jury instruction that police chief could be held liable if he

"knowingly refused to terminate a series of acts by others, which he knew or reasonably should

have known would cause others to inflict the constitutional injury") (brackets omitted).   ODOC is

faced with the "unenviable task of keeping dangerous men in safe custody under humane

conditions."   *Spain v. Procunier*, 600 F2d 189, 193 (9th Cir 1979), quoted in *Farmer*, 511 US at

845.   The issue is whether defendants acted reasonably to reduce the threat of harm to Chandler,

as a sex offender, from other inmates, considering legitimate institutional considerations.

### a.   <u>Separate Facility for Sex Offenders</u>

Chandler's claims rest primarily on his demand that ODOC create, maintain, and place him

in a facility only for sex offenders.   Defendants assert that they are not deliberately indifferent to

the risk of harm to Chandler and other sex offenders by rejecting this option.

In support, defendants have submitted with their Reply a declaration by the EOCI Assistant

Superintendent of Security that "ODOC attempted to place all sex offenders in the same facility

several years ago."   Lemens Supp. Decl., ¶ 4.   However, it proved "more difficult to protect sex

offenders" due to the need for frequent inmate movement to separate inmates in conflicting gangs

or who otherwise posed a security threat.   *Id*.   Inmates transferred from the segregated facility

were automatically labeled as sex offenders and were one of the very few at the new facility,

"placing them at significantly greater risk."   *Id*.   "As a result, inmates did not want to be housed

at the prison made up of sex offenders for any period of time."   *Id*.   In other words, ODOC has

already unsuccessfully tried Chandler's suggestion.

However, as Chandler points out, Lemens' statement is suspect.   First, he does not state when or for how long ODOC placed all sex offenders in the same facility.   Given that Chandler has been incarcerated since 2003, it is reasonable to infer that the attempt occurred prior to 2003. Lemens does not state whether he was even employed by ODOC then or provide the source of his knowledge for his conclusion that the attempt was unsuccessful.   His statement may be based on personal knowledge, but that is not evident from his terse and conclusory declaration.   Second, based on the evidence submitted by Chandler, other inmates quickly can ascertain whether a person is a sex offender.   Thus, it is hard to see how being transferred from a sex offender facility would place such an inmate at any greater risk than he already faces.

Third, Lemens' statement is the only evidence offered by defendants over four years of litigation that a separate prison for sex offenders was ever attempted.   This is a critical fact that, if true, would seemingly be dispositive as to Chandler's request for a separate facility for sex offenders.   Yet, oddly, even Belleque, the manager of security for all of ODOC's facilities, says nothing in his declaration about this prior unsuccessful attempt.   Finally, this evidence is offered for the first time in defendants' Reply after Chandler filed his opposition to summary judgment. In his surreply (docket # 195), Chandler complains that he repeatedly questioned EOCI officials regarding whether a separate prison for sex offenders existed or could be created, yet never received a response that this idea had been tried and considered unsuccessful.   Chandler has not had a sufficient opportunity to challenge Lemens' statement.

In addition to Lemens' declaration, however, defendants have submitted Belleque's declaration which addresses the security concerns raised by a facility housing only sex offenders. He explains that a crime-based classification system, as proposed by Chandler, is "fundamentally

29 - FINDINGS AND RECOMMENDATION

flawed because too many different types of criminal offenses and other factors would need to be considered to manage the number of possible placements for every offender.   Over time, crime-based housing decisions have proven to be inaccurate and not useful for primary housing assignment decisions."   Belleque Decl., ¶ 10.   As "developed over years of careful consideration," the "most important factor" is "offender behavior in relation to environment (such as misconduct while incarcerated, compliance with programming, and the amount of time remaining to serve on the sentence)."   *Id.*   He also points out that if sex offenders were segregated, numerous "other particular groups of inmates could claim to be in need of specialized or separate housing as well," which "would amount to promoting the very security threat group activities that ODOC seeks to prevent."   *Id*, ¶ 11.   Sex offenders also "have their own typologies," including child molesters, adult molesters, homosexuals, heterosexuals, bisexuals, predators, and opportunists, as well as some who become sex offenders only after "becoming imprisoned without a willing sex partner."   *Id*, ¶ 12.   Thus, "an attempt to segregate all types of sex offenders from other (non-sex offender) inmates would be problematic and not in the best interest of safety and security of the inmates and staff."   *Id.*   Another complicating factor is that a sex offender could also be "a member or affiliate of a white supremacist group, African-American STG or an Asian STG."   *Id*, ¶ 14.

Based on this evidence, ODOC employs a time-tested classification system for housing that has a legitimate penological interest.   Segregation of sex offenders is not, in the reasoned opinion of ODOC, the best way to house and protect inmates.   Virtually the only attribute common to all ODOC inmates is that they have been convicted of a crime and sentenced to a term of imprisonment.   Otherwise, they come in all ranges of age, physical characteristics, mental

capacity, sexual orientation, proclivity for violence, offender status, and group or gang affiliation. "It bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area."   *Cutter v. Wilkinson*, 544 US 709, 725 n13 (2005). That deference outweighs the personal belief of Chandler and some other sex offender inmates that ODOC would function better with complete segregation of sex offenders in a separate facility. Therefore, summary judgment should be granted against Chandler's claim premised on the lack of a separate facility for sex offenders.

### b.  Intermingling in Common Areas

Claims I and III also are premised on a failure to protect Chandler and other sex offender inmates in the dining hall and other common areas at EOCI where F2 Unit and GP housed inmates are forced to intermingle.   The issue is whether a reasonable juror could conclude that defendants were deliberately indifferent to the potential harm faced by Chandler arising from such intermingling.

Defendants point out that they have addressed Chandler's concerns and fears by placing him on the F2 Unit.   Although Chandler feels safer there, he must still avoid areas where GP housed inmates congregate, including the dining hall and exercise yard.   The issue is the potential for harm suffered by sex offenders when congregating in those areas.

The evidence in the record indicates that in 2009, prison officials responded to Chandler's overcrowding concerns in the dining hall by implementing the very suggestion that he made, namely to delay calling the F2 Unit to meals.   Chandler Decl., ¶ 1.   Despite the lack of an actual assault, prison officials responded to his complaint of dining room overcrowding by delaying the time the F2 Unit is called to the dining room, with both Chandler and prison officials indicating

that this change had helped by allowing more seats to clear before F2 Unit inmates made their way into the dining hall.   *Id.*   Far from showing deliberate indifference to Chandler's concern, this action shows a willingness by prison officials to incorporate inmate suggestions into their operational plans.

However, Chandler has submitted evidence that this change is not an official policy that has been uniformly implemented and instead has been applied inconsistently by the individual duty captains.   Chandler Decl., ¶¶ 1-2; Jones Decl., ¶ 4.   In fact, Coursey told Chandler that such a written policy was unnecessary.   Supp. Cady Decl., Att. 3.   As a result, the allowance of additional time does not always happen with the result that risky conditions in the dining hall continue despite Chandler's complaints.   Chandler Decl., ¶¶ 2, 4; Jones Decl., ¶ 4.   Because Chandler has never witnessed a wait of 10-20 minutes between the calling down of the F2 Unit and the next unit, he does not attend meals.   *Id.*

Inmates are not allowed to save seats in the dining hall.   McGraw Depo., p. 26; Dining Hall Rule 18.   If an officer sees one inmate turn another inmate away from a seat, he should intervene.   McGraw Depo., pp. 21-22.   This latter situation is not a violation of any rule.   Even if it were, rules are difficult to enforce since only four to six officers are present in the dining hall during meals with up to 177 inmates.   *Id*, p. 30; Supp. Cady Decl., Att. 3.   Given Chandler's evidence that seats are saved and inmates are not given permission to sit, it is reasonable to infer that officers are either unwilling or unable to enforce the rules in order to protect sex offender inmates.

Defendants also rely on the "time-tested process" of providing protective custody to inmates who "find themselves at peril in a general population housing settings."   Belleque Decl.,

¶ 15.   They point out that they offered to place Chandler in protective custody which he refused. Although Chandler admits that he was presented with an offer to transfer to another institution, he was not informed that it was for the purpose of protective custody or that he would be safer there than at EOCI.   Second Chandler Decl., ¶¶ 7, 9.   He states that he refused to transfer based on reasonable objections.   *Id*, ¶ 8.   This evidence is sufficient to create a fact issue.

Moreover, defendants have not addressed Chandler's evidence that it is extremely difficult for sex offenders to obtain protective custody.   According to Belleque, an inmate seeking protective custody "must reveal the identity of the person or person he claims to fear."   Belleque Decl., ¶ 15.   This is to ensure that the victim will not be placed in the same housing unit as the predator.   *Id*.   However, as revealed by Chandler's evidence, reporting the name of the perpetrator labels an inmate as a "rat" or "snitch" which places him at a greater risk of retribution. Although McGraw testified that he keeps a reporting inmate's name confidential, ODOC has no policy to that effect and not all officers are trained or told to do this.   McGraw Depo., p. 37. Therefore, an inmate who has been assaulted faces the threat of future assaults whether or not he requests protective custody.

Thus, whether defendants reasonably (1) refused to adopt the policy recommended by Chandler to address safety issues created by overcrowding in the dining halls or (2) disregarded his request for protective custody to avoid potential harm from intermingling in other areas with GP housed inmates are fact issues that cannot be resolved on summary judgment.

## II.  **Personal Participation**

Even if Chandler can prove an Eighth Amendment violation, many of the individual defendants seek summary judgment based on a failure to establish their liability as supervisors for

that violation.   When examining the liability of supervisors, "[i]t is clear that the supervisors are not subject to vicarious liability, but are liable only for their own conduct."   *Bergquist v. County of Cochise,* 806 F2d 1364, 1369 (9th Cir 1986).   To hold a supervisory official liable under § 1983, the plaintiff must show either: (1) personal participation in the constitutional deprivation; or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.   *Jeffers v. Gomez*, 267 F3d 895, 915 (9th Cir 2001); *Redman v. County of San Diego*, 942 F2d 1435, 1446 (9th Cir 1991), *cert denied*, 502 US 1074 (1992).

The supervisor's "personal participation" may include his "own culpable action or inaction in the training, supervision, or control of his subordinates," "his acquiescence in the constitutional deprivations of which the complaint is made," or "conduct that showed a reckless or callous indifference to the rights of others."   *Larez*, 946 F2d at 646 (internal citations, quotation marks, and alterations omitted).   A "sufficient causal connection" exists if the supervisor "implement[ed] a policy so deficient that the policy 'itself is a repudiation of constitutional rights.'"   *Redman*, 942 F2d at 1454-55 (citations omitted.).   However, a supervisor's "general responsibility for supervising the operations of a prison is insufficient to establish personal involvement."   *Id* at 1455 (citation omitted).

Chandler alleges that Williams (ODOC Director), Coursey (Acting EOCI Superintendent), and Mills (former EOCI Superintendent) are liable in their capacity as supervisors and were "responsible for formulating, enacting, and overseeing enactment of the ODOC policies and practices that form the basis of this complaint."   Amended Complaint, pp. 5, 7.   As discussed above, no defendant is liable for a housing policy that fails to segregate sex offenders into a

separate facility.   The remaining issue is which defendant may be held liable as deliberately indifferent to Chandler's safety when intermingling with GP housed inmates.

Based on the record, Coursey received and responded to several grievances by Chandler in 2009-11 about the dining hall and personally participated in the failure to develop a dining hall policy that would protect Chandler and other sex offender inmates.   Cady Decl., Att. 6, 7; Supp. Cady Decl., Att. 3, 6.   This is sufficient for supervisory liability as to the dining hall issues.   The record is unclear as to what role, if any, he played with respect to other safety issues facing sex offender inmates.   However, as the top administrator at EOCI, it is reasonable to infer that he played some responsible role for developing and implementing policies or, at the very least, approving all procedures followed at EOCI.   Since he knew or should have known of the pervasive risk faced by sex offenders at EOCI, a reasonable jury could find that he was deliberately indifferent by failing to exercise his authority to make appropriate changes in order to better protect sex offender inmates in the F2 Unit when intermingling with GP housed inmates.

The record is sparse as to the role of Mills who preceded Coursey as the EOCI Superintendent.   Chandler complained about harassment to Mills in August 2005 and requested a segregated facility, to which Mills responded there were none.   Chandler may have made the same request to Mills again before June 2008 when Mills ceased in his role as EOCI Superintendent.   Cady Decl., Att. 3, 4.   Given his position, Mills knew of or should have known of the pervasive risk faced by sex offenders at EOCI and, although not in any way responsible for the lack of a separate sex offender facility, could be held liable for failing to exercise his authority to provide better protection at EOCI while he was the EOCI Superintendent.

However, Chandler does not seek monetary damages against Mills and instead seeks only declaratory and injunctive relief.   Such relief is not available against Mills in his individual capacity "if the act must be in his official capacity to have official consequences."   *Evans v. Bayer*, 684 F Supp2d 1365, 1369 (SD Fla 2010); *see also Barrish v. Cappy*, No. 06-837, 2006 WL 999974, at *4 (ED Pa Apr. 17, 2006) ("we do not see how a court can order an officer in his personal capacity to take an official act.").   Moreover, a claim against a person in his former official capacity "has no meaning."   *Wishom v. Hill*, No. Civ. A. 01-3035-KHV, 2004 WL 303571 (D Kan Feb. 13, 2004).   When a "party in an official capacity dies, resigns, or otherwise cases to hold office while the action is pending," then the "officer's successor is automatically substituted as a party."   FRCP 25(d); *Kentucky v. Graham*, 473 US 159, 166 n11 (1985).   Since Chandler also sues the current Acting EOCI Superintendent (Coursey), substitution is not necessary, and the official capacity claims against Mills, the former EOCI Superintendent, is redundant.   Therefore, Mills should be dismissed as a party.

The record is sparse as to role played by Williams, the ODOC Director.   Chandler wrote to Williams in June 2007 about sex offenders being targeted for extortion, harassment, and assault and proposing segregation for the safety of sex offenders.   Cady Decl., Att. 5.   That letter was forwarded to Mills, the EOCI Superintendent at that time, for a response.   *Id*.   Mills' response is not in the record.   As the ODOC Director, Williams certainly had supervisory authority over EOCI.   However, it is far from clear what he knew about the particular situation at EOCI about which Chandler complained.   Without some evidence to show that he knew of and disregarded the danger at EOCI to sex offenders intermingling with GP housed inmates, he should be granted summary judgment against Claims I and III.

The only allegation against Emery (EOCI Counselor), Amesberry (EOCI Assistant Superintendent of Transitional Services), Hillmick (EOCI Counselor), and Maine (EOCI Grievance Coordinator) is that they rejected Chandler's request for segregated housing for sex offenders, advising him that such facilities did not exist within ODOC.   Amended Complaint, pp. 5, 7.   These allegations are simply not sufficient to establish an Eighth Amendment violation since they rest on the mistaken premise that housing assignments should be dictated by the inmate's conviction.   Although they may have been aware that Chandler's status as a sex offender put him at higher risk of assault by other inmates, there is no evidence that they were in a position to do anything to assist him.   In short, because Chandler has failed to allege or prove personal participation sufficient to establish an Eighth Amendment claim against Emery, Amesberry, Hillmick, or Maine, those defendants should be granted summary judgment against Claims I and III.

This leaves only Claims I and III alleged against McGraw.[8]   McGraw allegedly played a role mirroring that of several of the other defendants by responding to Chandler's grievances or advising Chandler that his appeals would not be allowed concerning his request for sex offender segregated housing.   Amended Complaint, p. 5.   The primary thrust of Chandler's 2009 complaints and later evidentiary submissions is that he faces an unconstitutionally high degree of risk in areas where he is forced to intermingle with inmates housed in GP units, particularly in the dining hall.   Chandler appears to contend that McGraw played a decisive role in formulating a

---

[8]   McGraw is not expressly mentioned in Claim III, but Chandler based his request for transfer alleged in Claim III on the need to be placed in "a safe environment for [him] to eat and exercise."   Amended Complaint, p. 7.

37 - FINDINGS AND RECOMMENDATION

response to his complaints of unsafe overcrowding in the dining hall.   This is sufficient personal participation with regard to that particular concern.[9]

## <u>RECOMMENDATION</u>

For the reasons set forth above, defendants' Supplemental Motion for Summary Judgment (docket # 174) should be GRANTED as to Claims I and III requesting a separate dedicated facility for sex offenders, GRANTED as to Claims I and III against defendants Williams, Mills, Emery, Amesberry, Hillmick, and Maine, and otherwise should be DENIED.

As a result, the remaining claims are Claims I and III for declaratory and injunctive relief against defendants Coursey and McGraw for being deliberately indifferent to the substantial risk of serious harm to Chandler when intermingling with GP housed inmates.

## <u>SCHEDULING ORDER</u>

These Findings and Recommendation will be referred to a district judge.   Objections, if any, are due December 21, 2012.   If no objections are filed, then the Findings and Recommendation will go under advisement on that date.   If objections are filed, then a response is due within 14 days after being served with a copy of the objections.   When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 4th day of December, 2012.

s/ Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge

---

[9]   It is not clear whether McGraw is the current person in charge of the dining room.   *See* McGraw Depo., p. 15.   If not, then he is not the proper defendant to provide the declaratory and injunctive relief requested by Chandler.