IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DAVID GEORGE CHANDLER**,<br><br>                Plaintiff,<br><br>        v.<br><br>**BRIGITTE AMSBERRY**, Acting Superintendent Eastern Oregon Correctional Institution; **TOM LEMENS**, Assistant Superintendent of Security Eastern Oregon Correctional Institution,<br><br>                Defendants. | Case No. 3:08-CV-00962-SI<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Diane C. Cady, P.O. Box 1424, Hillsboro, OR 97214. Of Attorneys for Plaintiffs.

Ellen F. Rosenblum, Attorney General, Shannon M. Vincent, Assistant Attorney General, and Andrew Hallman, Assistant Attorney General, Department of Justice, 1162 Court Street NE, Salem, OR 97301. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Plaintiff David Chandler ("Chandler" or "Plaintiff") is a convicted sex offender confined by the Oregon Department of Corrections ("ODOC") at the Eastern Oregon Correctional Institution ("EOCI"). Chandler brings this lawsuit pursuant to 42 U.S.C. § 1983, alleging that

PAGE 1 – OPINION AND ORDER

Brigitte Amsberry and Tom Lemens, in their official capacities,[1] ("Defendants")[2] are deliberately indifferent to the risk of harm faced by Chandler when he intermingles with inmates from the general prison population, particularly in the dining hall. Chandler alleges that ODOC dining hall and protective custody policies and procedures are constitutionally deficient. Chandler seeks only equitable relief.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. The Court held a bench trial on February 6, 2014. Having weighed and evaluated all of the evidence in the same manner that it would instruct a jury to do and having fully considered the legal arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a). For the reasons that follow, the Court finds in favor of Defendants.

## FINDINGS OF FACT

Pursuant to Federal Rule of Civil Procedure 52(a), the Court finds the following facts by a preponderance of the evidence.

**A. Stipulated Facts**

The parties agreed to certain facts in their Pretrial Order (ECF 215), although the parties disputed the relevancy of some of those facts. The Court finds the following agreed-upon facts to be true and relevant:

---

[1] Chandler originally brought suit against Richard Coursey, former Acting Superintendent at EOCI and Richard McGraw, former Assistant Superintendent of Security, in their official capacities. The pleadings were amended, substituting, in their official capacities, Defendant Brigitte Amsberry, the current Acting Superintendent, in the place of Richard Coursey and Defendant Tom Lemens, the current Assistant Superintendent of Security, in the place of Richard McGraw. ECF 233, 237. The parties agreed that these substitutions would not affect Plaintiff's claims.

[2] Chandler had filed claims against several additional defendants. The pleadings were amended to dismiss those defendants. ECF 215.

PAGE 2 – OPINION AND ORDER

1. Chandler is an inmate currently housed at EOCI within ODOC.

2. Chandler has been primarily housed at EOCI since March 2003, except for three weeks spent at Snake River Correctional Institution for mental health evaluation. Chandler was convicted of sex offense crimes.

3. Before being housed at EOCI, Chandler was held in the Clackamas County jail and Coffee Creek Correctional Facility ("CCCF") for intake.

4. For the most part, Chandler has been assigned to the Mental Health Unit ("MHU") (also referred to as F-2) at EOCI, which is an open, dormitory-style housing unit. The MHU has a capacity of 80 inmates and currently is full. Chandler's assignment to the MHU is not guaranteed for the length of his sentence.

5. Richard Coursey served as Superintendent of EOCI since 2008. Coursey received and responded to inmate communications and grievances by Chandler regarding Chandler's allegations that EOCI's dining hall is unsafe and overcrowded.

6. Richard McGraw currently serves as the Superintendent of General Services and supervises the plant and food services as well as the inmate work program. His prior positions at EOCI include officer, Sergeant, Captain, Transitional Services Manager, and Assistant Superintendent of Security. McGraw responded to communications and grievances by Chandler regarding Chandler's allegations that EOCI's dining hall is unsafe and overcrowded.

7. ODOC does not house inmates based on their crimes of conviction. Inmates are evaluated to determine the appropriate level of supervision needed based on their behavior in relationship to their environment. This is referred to as an inmate's "custody level."

8. Inmates at EOCI can request protective custody (also referred to as administrative segregation), but they must identify the specific risk or harm (and/or person(s) who have caused

harm or threatened harm) in order to prevent a housing assignment in the same unit or cell as inmate(s) posing a risk of harm.

9. A grant of protective custody at EOCI is preceded by a number of administrative requirements.

10. Chandler requested protective custody from EOCI officials, but never identified any specific risk of harm or any specific person(s) who caused him harm or threatened him.

11. ODOC offered to transfer Chandler to another institution but he refused.

12. In the spring of 2005, Chandler reported to mental health staff that he had been assaulted on the MHU by another inmate who grabbed Chandler by the throat and slapped him, called him "rape-o" and told Chandler not to disrespect him. Chandler experienced temporary pain, but did not require medical treatment.

13. Apart from the alleged slap in 2005, Chandler has never been assaulted by another inmate while in ODOC custody.

14. Chandler has never been explicitly extorted by another inmate while in ODOC custody.

15. Chandler feels safer on the MHU than any other location at EOCI, but believes he is exposed to a significant risk of harassment, threats and assault whenever he comes into contact with the general prison population.

16. Chandler is in contact with general population inmates in the dining hall and whenever he leaves MHU.

17. The dining hall where Chandler attends meals has up to 177 inmates present during meals. Four to six officers are on guard during meals.

18.     Coursey told Chandler that a written policy relating to the lapse of time between calling the units to the dining hall or specifically before calling down the MHU was unnecessary.

## B.  Facts the Court Finds Established at Trial

### 1.  Credibility of Witnesses

In these findings of fact, the Court relies on the testimony of the following seven witnesses who testified at trial: Chandler; three inmates called by Chandler; Lemens; ODOC Eastside Institutions Administrator Steven Franke; and Correctional Captain Dave Lilienthal. Having observed and considered the testimony of each of these witnesses, the Court concludes that they provided credible testimony.

### 2.  General Prison Conditions

As of February 2014, approximately 14,600 inmates are housed with ODOC. Approximately 30 percent of those inmates are identified as sex offenders by ODOC. Approximately 1,700 inmates are housed at EOCI, and approximately 45 percent of those inmates are identified as sex offenders.

Prisons have "security threat groups," commonly called "gangs." Some gangs accept persons convicted of sex offenses within the gang, although the Caucasian gangs usually do not allow sex offenders in the gang.

There are many vulnerable populations in prison, including sex offenders, elderly prisoners, prisoners under the age of 25, prisoners with slight physical stature, prisoners with physical or mental disabilities, prisoners who are first offenders, prisoners with known mental illness, prisoners with a past history of victimization, and prisoners who have withdrawn from a gang. Prison staff attempt to teach or coach all prisoners on how to carry themselves and otherwise behave to minimize risk.

"Extortion" occurs in prison. This is where one inmate threatens another and demands something from the other inmate, such as canteen items or that the extorted inmate threaten or assault a third inmate. Sex offenders are both perpetrators and victims of extortion. Prison officials acknowledge that in general, sex offenders are targeted more often for extortion. Members of "incentive units,"[3] also known as "honors units," are also targeted for extortion because they have more to lose and want to keep a clear conduct record to stay in the incentive unit. Many inmates have reported extortion and identified the person or persons committing the extortion, and those inmates committing the extortion have been disciplined.

There are several options for inmates to report incidents involving other inmates, including sending a written communication ("kite"), verbally telling a security officer, requesting a medical visit and asking medical staff to contact security, informing a counselor, or calling a confidential, toll-free hotline. There is also a confidential informant process by which reporting inmates can remain confidential. In Captain Lilienthal's 25 years of experience, none of his informants have been assaulted.

### 3. Dining Hall

#### a. General procedures

Inmates are not called to the dining hall for breakfast, lunch, or dinner until after a prison inmate count is completed and all inmates are accounted for. After the count is clear, inmates with early work assignments or educational needs are called first. After those inmates have eaten and the dining hall has begun to thin out, inmates housed in the incentive units are called. After those early units are called, all remaining units are called on a rotating basis that changes weekly.

---

[3] Incentive units are housing units that receive additional privileges. A prisoner must be invited to join an incentive unit. To be eligible, prisoners must have 18 months of clear conduct and are generally prisoners who are more cooperative and less violent.

PAGE 6 – OPINION AND ORDER

The order in which units are called to the dining hall rotates for fairness, to avoid favoritism, and to prevent resentment among the housing units. Inmates are generally not resentful of the honors unit getting to go first because that is understood as part of the benefits of being in the honors unit, which is earned by good behavior.

The prison administration would be concerned if the MHU were allowed always to eat first or even last. There is concern that such a procedure would cause resentment, draw even more focus onto MHU residents, or make MHU residents an even bigger target. There is also concern that if MHU residents behave inappropriately and still get to eat first or last, that will be rewarding bad behavior. There is also a general concern of fairness and treating all housing units equally except for the incentive units, where inmates receive additional privileges as a reward for their good behavior.

Inmates have 30 minutes to get from their housing unit to the dining hall, eat their meal, and return to their housing unit. After meals, inmates participate in yard time, but the yard does not open until the dining hall is clear because the same staff supervise the dining hall and the yard.

The timing of when each unit is called to the dining hall depends on the flow of any given meal. Meals that are more popular or require more servers usually take longer. Less popular and more easily served meals take less time. Additionally, if there is a medical or security event, that can affect the meal schedule. The sergeant on duty evaluates the flow of the meal service and the available seats and makes a judgment call as to when to call in the next unit. Generally, the MHU and E2, which is a unit comprised of a higher percentage of elderly prisoners, get a few extra minutes before the next unit is called. There is no written policy on providing extra time for the MHU or on the timing of calling the units generally.

There are between five and seven security officers on duty per meal. There is a sergeant located in the back of the dining hall, an officer in the scullery, two officers in the serving line, and one to three other officers roaming the dining hall during each meal service.

### b. Security concerns

While in the dining hall, Chandler has witnessed other inmates being asked about their criminal charges and convictions and has witnessed inmates saving seats or refusing to allow a particular inmate to sit in a particular seat in the dining hall. Inmates save seats or refuse to allow other inmates to sit for a variety of reasons, including gang affiliation, ethnicity, whether the inmate saving the seat is waiting for a friend, and whether the inmate attempting to sit was convicted of a sex offense. Savings seats is not allowed under prison rules, but it occurs. Officers have disciplined inmates for savings seats and have ordered inmates to sit in a particular seat if the inmate is roaming the dining room too long.

Chandler has been called a "rape-o" in the dining hall and has been asked who his "landlord" is or to whom he is "paying rent," meaning who is extorting him. On one occasion, Chandler sat in the section of the dining room where African-American inmates often sit and he was asked by an inmate why Chandler was sitting there rather than someplace else in the dining hall. Chandler threw away his food and left the dining hall. Chandler has struggled to find seats in the "white" section of the dining hall.

In the approximately 11 years that Chandler has been an inmate in EOCI, he has witnessed approximately 20 assaults in the dining hall. He is not aware of the circumstances or motivations for those assaults or whether the assaults were related to any inmate's sex offender status. Chandler has never been assaulted in the dining hall or in any general population area. Chandler does not believe that the one assault committed against him that occurred in the MHU was related to his sex offender status.

PAGE 8 – OPINION AND ORDER

The first inmate witness called by Chandler is currently housed in another institution and has not been housed at EOCI for more than two years. While at EOCI, he was always truthful when asked what were his charges, and he was never assaulted. He was subjected to "offensive language" and "threatening postures and tones." Tr. 45:17-19. On one occasion, an inmate appeared ready to fight him in his housing unit, but he diffused the situation by telling the other inmate the nature of his charges as a sex offender and no physical altercation occurred. This witness paid "rent" to a gang on three occasions because he thought it was easier and afforded him some level of protection and he thought everyone was doing it. He believes that he was targeted to pay rent because he was a sex offender, although he does not believe that is the only situation in which rent is extorted. This witness was not threatened when he was approached to pay rent and he did not report his extortion to prison security.

This inmate witnessed approximately one dozen assaults at EOCI—in the dining hall, housing unit, and by the canteen. He does not believe that any of those assaults were related to an inmate's sex offender status. This witness regularly attended meals in the dining hall. He did not feel fully safe because fights would break out from time to time and inmates are "unpredictable." Additionally, he and others from the MHU were subjected to verbal harassment in the dining hall that made him uncomfortable. He experienced direct insults, such as being called a "rape-o," implied threats, such as being stared at in a hostile manner, and general contempt. On several occasions, other inmates refused to allow this witness to sit near them because of the witness's status as a sex offender, but he was never physically threatened. Sometimes he sat down anyway, and he was not physically assaulted.

The second witness called by Chandler is currently an inmate at EOCI and has been housed there for approximately nine years. This witness also was convicted of a sex offense. He

PAGE 9 – OPINION AND ORDER

has been asked in the past about his charges and convictions, and he responds vaguely that it was a violent crime. He was extorted once in his housing unit because he was a sex offender. He paid the extortion for approximately three months, until a friend bartered on his behalf to end the extortion.

This witness has never been threatened or assaulted while at EOCI. He witnessed two assaults in the dining hall, one of which he knows was against a sex offender. He attends meals regularly, has felt tension in the dining hall, and has occasionally been turned away from a seat. This witness believes he was refused a seat either because an inmate was saving a seat for someone else or because the inmate believed this witness to be a "weirdo" because he was housed in the MHU. He was never threatened when he was refused a seat, and he always managed to find another seat.

The third and final witness called by Chandler currently is an inmate at EOCI and has been housed there for approximately two-and-one-half years. This witness was convicted of a sex offense. He has been threatened in the dining hall. On one occasion, he sat next to an inmate who asked about the witness's offense and then told the witness that if he ever sat there again, the inmate would "beat his ass." This witness experienced approximately five other, similar threats in the dining hall. On a few occasions, he has been turned away from a seat. He believes he has been turned away because inmates know about his charges or are saving seats for friends. When he has difficulty finding seats, there are many seats available but they are reserved for gang-affiliated inmates. He once sat in a gang-affiliated area and was threatened with violence. This inmate also has witnessed five assaults in the dining hall; three of which involved sex offenders as victims.

On one occasion someone attempted to extort this witness. When he lived in the general population housing unit, he was told that all sex offenders in that housing unit were paying rent. He refused to pay and was eventually assaulted in his housing unit. He was then moved to the MHU. He reported the attempted extortion to security and his counselors, but the witness did not identify the person or persons who were extorting him.

### 4. Protective Custody

EOCI does not have any long-term protective custody unit. Inmates can be placed into EOCI's administrative segregation unit for up to 30 days. For long-term protective custody, inmates are transferred the Administrative Segregation ("Ad Seg") Unit at the Two Rivers Correctional Institution ("Two Rivers").

EOCI administrators offered to move Chandler to the Two Rivers Ad Seg unit, where Chandler would be housed in a two-man cell and able to take his meals and yard time exclusively with that housing unit. Chandler testified that he was not given sufficient time to consider the offer—he was told to immediately accept or decline the transfer offer. He declined the offer because he wanted more time to consider it, speak with his counselor, and speak with his attorney regarding the potential effect of a transfer on this civil case against the prison. Chandler was also concerned that being in a closed, two-man bunk would be less safe than being in the open, dormitory-style housing in the MHU.

## CONCLUSIONS OF LAW

Based on the foregoing Findings of Fact and the legal standards that follow, the Court makes the following Conclusions of Law pursuant to Rule 52(a)(1).

To state a claim under Section 1983, "a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law." *Long v.*

*Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Here, Chandler claims that his rights under Eighth Amendment were violated.[4]

The Eighth Amendment imposes a duty on prison officials "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)) (quotation mark omitted). Having confined persons with antisocial, often violent, propensities and prevented them from protecting themselves or seeking outside aid, "the government and its officials are not free to let the state of nature take its course." *Id.* "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials . . . ." *Id.* at 834. To establish a *constitutional* injury, two additional requirements must be met.

First, the alleged deprivation must be objectively serious. For a claim "based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* Second, the defendant-official must have a subjectively culpable state of mind, one of "deliberate indifference" to inmate health or safety. *Id.* This means that "the official knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. Deliberate indifference exists when an official is "aware of facts from which the inference could be drawn that a substantial risk of harm exists," actually draws such an inference, and "disregards that risk by failing to take reasonable measures to abate it." *Id.* at 838, 847. The Eighth Amendment prohibits cruel and unusual *punishment*, and the infliction of such

---

[4] The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., 8th Am.

punishment requires at a minimum the conscious disregard of a known substantial risk of serious harm. *See id.* at 837-40.

A prison official may be culpable even if he does not know which specific prisoner may be assaulted or by whom, or even if the threat is generalized to all similarly-situated prisoners. *See id.* at 843 ("[I]t does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk."). A prison official who knows of a substantial risk may avoid liability if he or she "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844. In evaluating the reasonableness of the response, courts should take "due regard" of the institutional constraints faced by prison officials who have the "'unenviable task of keeping dangerous men in safe custody under humane conditions.'" *Id.* at 845 (quoting *Spain v. Procunier*, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.)); *see also id.* ("[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishment Clause.").

### 1. Chandler Did not Prove that he Faces a Substantial Risk of Serious Harm

Chandler has not presented evidence that he has suffered any *actual* serious injury sufficient to establish his claim for cruel and unusual punishment. The only injury he suffered was the slap in MHU, which he admits was not serious, not related to his status as a sex offender, and not in a general population area. Chandler may, however, still establish an Eighth Amendment claim based on an objective risk of serious future harm. *See Farmer*, 511 U.S. at 845.

Chandler, however, has not presented evidence that he faces a substantial risk of serious future harm in general population areas as a result of his status as a sex offender. None of the inmates who testified at trial were assaulted in the general population areas. The witnesses

PAGE 13 – OPINION AND ORDER

testified to infrequent assaults that they witnessed on other inmates in general population areas. The witnesses mostly testified, however, that they did not believe those assaults necessarily were related to the victim's status as a sex offender. For the few assaults that witnesses testified might be related to the victim's sex offender status, the witnesses did not have personal knowledge and were merely speculating. Moreover, no evidence was submitted showing the seriousness of those assaults or whether they were mutually-instigated combat situations. The infrequency and individual circumstances of those assaults do not support a finding that Chandler faces a substantial risk of being seriously harmed in the general population areas because of his status as a sex offender. *See, e.g.*, *Shelton v. Reinke*, 2013 WL 1319630, at *8 (D. Idaho Mar. 28, 2013).

Chandler and the other inmates testified that they were subjected to implied threats through hostile stares and body language and offensive comments. An inmate need not wait until he is actually assaulted to bring an Eighth Amendment claim. See *Farmer*, 511 U.S. at 845. General intimidation, harassment, and nonspecific threats, however, although undesirable, do not demonstrate a constitutionally intolerable risk of harm. *See Williams v. Wood*, 223 F. App'x 670, 671 (9th Cir. 2007) ("[S]peculative and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently substantial risk of serious harm to [plaintiff's] future health."); *Gaut v. Sunn*, 810 F.2d 923, 925 (9th Cir. 1987) (holding that a "mere naked threat" cannot constitute an Eighth Amendment violation and that it "trivializes the eighth amendment to believe that a threat constitutes a constitutional wrong"); *Funk v. Schriro*, 2009 WL 4898262, at *7 (D. Ariz. Dec. 14, 2009) (finding that a prisoner's "claim that he was forced to endure a 'constant threat of violence' is too general and conclusory to make the objective showing required on an Eighth Amendment claim"); *see also Corales v. Bennett*, 567 F.3d 554, 564-65 (9th Cir. 2009)

PAGE 14 – OPINION AND ORDER

(upholding and applying *Gaut* for the principle that mere threats cannot demonstrate constitutional deprivation).

Critical to the analysis of whether a threat of harm can rise to the level of an Eighth Amendment violation is the imminence of the threat and the present ability of the person or persons making the threat to effectuate the threat. *See, e.g.*, *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) ("The standard does not require that the guard or official 'believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But, on the other hand, he must have more than a mere suspicion that an attack will occur.'") (quoting *State Bank of St. Charles v. Camic*, 712 F.2d 1140, 1146 (7th Cir. 1983)); *Parker v. Asher*, 701 F. Supp. 192, 195 (D. Nev. 1988) (allowing an Eighth Amendment claim to proceed where there was a threat of imminent bodily harm and a present ability to effectuate that threat, noting that "[a] vast difference exists between a 'mere naked threat' and a loaded gun aimed in support of a threat" (citing *Hudspeth v. Figgins*, 584 F.2d 1345, 1348 (4th Cir. 1978))). Chandler did not present evidence of a specific or direct threat of imminent bodily harm and the ability of another to effectuate that harm.

Chandler claims that because he is sex offender, he is a "vulnerable" prisoner and, therefore, faces a substantial risk of serious harm whenever he is in the general population. There are many factors that are considered to determine if a prisoner may be "vulnerable," and whether the prisoner has been convicted of a sex offense certainly is one factor. The fact that one or more factors may apply to a prisoner, however, does not automatically equate to a substantial risk of serious harm whenever that prisoner is in an area where he can mingle with the general population. Such a threat is too general and too speculative to reach a constitutional dimension.

PAGE 15 – OPINION AND ORDER

There may be, however, a substantial risk of serious harm where vulnerable prisoners and aggressive prisoners are placed together, unsupervised and unpatrolled. *See, e.g.*, *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76 (6th Cir. 1995). The evidence in this case, however, demonstrates that the dining hall and other areas where Chandler interacts with the general population are supervised and that Chandler has not been assaulted in any general population area in the more than 11 years that he has been an inmate at EOCI. This evidence does not support Chandler's claim that EOCI is failing to protect him and that he faces a substantial risk of serious harm in general population areas. *See, e.g.*, *Leskovec v. Doe #1*, 2010 WL 2899903, at *4 (D. Mont. June 30, 2010) (finding that the plaintiff, who was previously raped by another inmate and threatened by that inmate that the plaintiff would be raped again, failed to state an Eighth Amendment claim because the two prisoners only interacted in the dining hall, which was supervised and because the plaintiff had been attending chow with his assailant for more than a year without incident).

Based on the evidence at trial, the Court finds that Chandler did not prove by a preponderance of the evidence the objective element of his Eighth Amendment claim—that he faces a substantial risk of serious harm when he is in general population areas because he is a sex offender.

### 2. Defendants Were not Deliberately Indifferent to an Excessive Risk to Chandler's Health or Safety

Chandler also did not prove by a preponderance of the evidence that Defendants were deliberately indifferent to a substantial risk of serious harm. Deliberate indifference is a stringent standard of fault, and neither negligence nor even gross negligence amounts to deliberate indifference. *See Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1064 (9th Cir. 2006). Officials must have known facts from which an inference could be drawn that a substantial risk of serious harm existed, actually drew the inference, and then disregarded the risk by failing to take

PAGE 16 – OPINION AND ORDER

reasonable steps to address it. *Farmer*, 511 U.S. at 838, 847. Chandler failed sufficiently to prove any of these three elements.

Chandler proved that EOCI officials were aware of Chandler's subjective fears. This is not proof, however, that the officials were aware of facts that give rise to a reasonable inference that Chandler faced a substantial risk of serious harm in general population areas. To the contrary, the evidence shows that there were infrequent assaults in general population areas and that those assaults were generally not a result of an inmate's status as a sex offender. The evidence also shows that although sex offenders are targeted for extortion, generally that extortion is not reported to prison officials and does not involve assaultive behavior. There was evidence of only one violent incident relating to extortion, and that occurred in a housing unit and not in a general population area. Therefore, the evidence does not show that prison officials were aware of facts giving rise to an inference of the serious risk claimed by Chandler.

In addition, there is insufficient evidence to prove that Defendants actually drew the inference that such a serious risk existed. Although Chandler reported his fears to prison officials, he was never threatened with bodily harm or assaulted as a result of being a sex offender and there is no evidence that prison officials subjectively believed that Chandler faced a significant risk of serious harm in general population areas. With regard to assaultive behavior against sex offenders generally, the evidence shows that prison officials attempt to teach or coach all inmates to focus on how they carry themselves and behave because those are what the prison officials believe are the most critical indicia of victimization. Although prison officials acknowledge that sex offenders are one of several populations that are generally more vulnerable, the evidence does not show that prison officials believe all sex offenders face a significant risk of serious harm. To the contrary, prison officials testified that they have seen

PAGE 17 – OPINION AND ORDER

many sex offenders successfully navigate incarceration without incident. Approximately 45 percent of EOCI prisoners are identified as sex offenders, and there was no evidence presented that any of them experienced serious harm or a specific threat of serious harm in general population areas. Notably, the prison officials testified that they do not believe there is anything more that EOCI reasonably could do to provide better protection for sex offenders. The Court finds that the prison officials did not have the subjective belief that either Chandler or sex offenders generally face a significant risk of serious harm in general population areas.

With regard to extortion, EOCI officials know that extortion occurs in prison and that sex offenders are among the populations more vulnerable to extortion. When extortion is reported, EOCI officials investigate and hold those engaging in extortion accountable for substantiated claims. This does not show, however, that EOCI officials subjectively believe that the fact that extortion exists and that sex offenders are more vulnerable to extortion means that sex offenders face a significant risk of serious bodily harm. There was no evidence presented at trial from which the Court reasonably can draw such an inference.

Finally, the evidence does not show that Defendants unreasonably responded to Chandler's complaints. The reasonableness of Defendants' response is evaluated in light of institutional restraints: "the legal standard [of deliberate indifference] must not be applied to an idealized vision of prison life, but to the prison as it exists, and as prison official(s) are realistically capable of influencing." *Berg*, 794 F.2d at 462. Prison officials are faced with "the unenviable task" of housing and controlling dangerous men. *Farmer*, 511 U.S. at 845. Federal courts "must defer to prison officials' expert judgments." *Norwood v. Vance*, 591 F.3d 1062, 1066 (9th Cir. 2010). This "deference requires 'that neither judge nor jury freely substitute their

PAGE 18 – OPINION AND ORDER

judgment for that of officials who have made a considered choice.'" *Id.* at 1066-67 (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

Chandler argues that Defendants unreasonably responded to Chandler's complaints because Defendants did not institute or adopt a written policy that provides that inmates housed in the MHU may eat first or last, or, at a minimum, require a longer delay between calling the MHU and other housing units to the dining hall. Defendants made a considered choice not to call the MHU first or last to the dining hall, and that decision was reasonable, although other options also likely would have been reasonable.

Defendants also made a considered choice to allow the sergeant in the dining hall to exercise discretion and have flexibility in calling the housing units for meals and not to institute formal, written policies regarding the timing of calling the different units. This decision was the product of balancing resources, considering the finite time available for meals, maintaining flexibility to respond to changing conditions, promoting security, and understanding the varying nature of any given meal and the timing needs of that particular meal on that particular day. Although adopting a formal policy may not be as detrimental as Defendants fear, the Court does not find Defendants' decision unreasonable and will not substitute the Court's judgment for that of Defendants.

Chandler also claims that Defendants are deliberately indifferent because they allow the saving of seats to occur in the dining room. Seat saving is prohibited under prison rules, but Defendants acknowledge that it does occur. There is no evidence, however, that seat saving causes violence or a substantial risk of serious harm that Defendants are unreasonably ignoring by not more forcefully enforcing the prison's policy against seat saving.

### 3. Deliberate Indifference with Respect to Defendants' Protective Custody Policy

Chandler claims that Defendants' protective custody policy is constitutionally deficient and that Defendants are deliberately indifferent to Chandler's safety by failing to put him in protective custody. In requesting protective custody, an inmate must specifically identify the reason he believes he needs protection and, if applicable, who is threatening the inmate. An inmate may request to be a "confidential informant." Although Chandler did not follow EOCI's policy, he was still offered protective custody, and he declined.

Based on the evidence presented at trial, EOCI's policy is the result of a considered choice and is reasonable. Neither the general policy nor how it was applied to Chandler reflects deliberate indifference to a substantial risk of serious harm.

## CONCLUSION

Based on the evidence presented at trial, the Court finds in favor of Defendants.

**IT IS SO ORDERED**.

DATED this 28th day of March 2014.

/s/ Michael H. Simon  
Michael H. Simon  
United States District Judge